UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
ALEX WONG,

Petitioner,

- against - 12 CV 5749 (RJD)

UNITED STATES OF AMERICA,

Respondent.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

MEMORANDUM OF LAW IN RESPONSE TO
MOTION PURSUANT TO 28 U.S.C. § 2255

LORETTA E. LYNCH,
United States Attorney,
Eastern District of New York.

PETER A. NORLING,
Assistant United States Attorney
(Of Counsel).

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ....................................................1

STATEMENT OF FACTS ....................................................3

I. The Offenses and the Trial ....................................................3

II. The Sentencing ....................................................3

III. The Collateral Attacks ....................................................4

IV. The Motion for Leave to File a Successive Motion ....................................................4

ARGUMENT:

BECAUSE MILLER IS RETROACTIVE TO CASES ON COLLATERAL REVIEW AND APPLIES TO MANDATORY GUIDELINES DETERMINATIONS, THE COURT ERRED IN SENTENCING WONG UNDER A GUIDELINE MANDATING A LIFE TERM OF IMPRISONMENT AND HE SHOULD THEREFORE BE RESENTENCED ....................................................6

I. Miller Applies Retroactively to Cases on Collateral Review ....................................................6

A. Miller Announced a New Rule ....................................................8

B. The New Rule Announced in Miller Is Substantive ....................................................10

II. Miller Applies to Guideline-Mandated Life Sentences ....................................................16

III. A Miller Claim Can Be Brought in a Second Section 2255 Motion ....................................................17

CONCLUSION ....................................................19

## PRELIMINARY STATEMENT

The government submits this memorandum in response to Petitioner Alex Wong's pro se motion, filed November 26, 2012, for relief under 28 U.S.C. § 2255. Wong was convicted, after a jury trial, in the 1992 "Green Dragons" case before then-District Court Judge Reena Raggi, of racketeering, in violation of 18 U.S.C. § 1962(c), racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), and conspiracy to commit murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5), and was sentenced principally to life imprisonment. (See 90 CR 1019, Docket entry ("DE") 70). His conviction was affirmed in United States v. Wong, 40 F.3d 1347 (2d Cir. 1994).[1]

Wong now seeks habeas relief based upon the Supreme Court's decision in Miller v. Alabama, 132 S. Ct. 2455 (2012), which held that the Eighth Amendment's Cruel and Unusual Punishments Clause precludes application of a mandatory life term of imprisonment without the availability of parole on defendants who committed their offenses when they were juveniles. As more fully set forth below, while the statutes under which Wong was sentenced

[1] Two other defendants in this trial -- Roger Kwok and Joseph Wang -- have similarly filed motions for resentencing under Miller. See Kwok v. United States, 13 CV 1267 (WFK)(ordering transfer to the United States Court of Appeals for the Second Circuit for consideration of whether Kwok's motion meets the "gatekeeping" provisions pertaining to second or successive motions under Section 2255), which case, under the transfer order, is currently pending in the Court of Appeals, see Kwok v. United States, No. 14-0911. (Kwok has also brought a pro se motion based on Miller in the related criminal case (United States v. Wong, 90 CR 1019 (SJ)), which motion has been ordered held in abeyance pending resolution of the motion made in the civil case.) Wang's motion (Wang v. United States, 13 CV 3524 (DLI)) has been briefed and is awaiting decision. The issue has also been raised in three non-Green Dragons cases: Stone v. United States, 11 CV 2763 ILG (writ granted; resentencing scheduled for May 30); Rosario v. United States, 12 CV 3432 (ARR)(writ granted; resentencing scheduled for September 3); Mejia-Velez v. United States, 13 CV 3372(ERK) (argument on motion scheduled for July 2).

to life imprisonment did not require such a term, it was required by the then-mandatory United States Sentencing Guidelines. Because his claim arises in a second petition under Section 2255, he must meet the standards for filing a second or successive petition as set forth in 28 U.S.C. § 2244(b)(2)(A). The case is before this Court pursuant to an order of the United States Court of Appeals for the Second Circuit dated September 26, 2013, finding that Wong has made a prima facie showing that his claim meets the requirements of for a successive petition because it relies on a new rule of constitutional law -- that set forth in Miller -- made retroactive to cases on collateral review by the Supreme Court that was previously unavailable. The Court of Appeals ordered this Court to address preliminarily whether the Miller decision announced a new rule of constitutional law made retroactive to cases on collateral review, permitting the underlying Section 2255 petition to proceed.

As we show below, Wong's issue may be reviewed because it meets the conditions for filing a successive petition set forth in 28 U.S.C. § 2244(b)(2)(A), and, on review of the merits of the Section 2255 motion, Miller applies retroactively to Wong's case. His sentencing under mandatory Guidelines therefore constituted error and he should be resentenced.

## STATEMENT OF FACTS

### I. The Offenses and the Trial

The facts pertinent to Wong's claim are set forth in Wong. Briefly, Wong was a member of the Green Dragons gang. As the Wong court put it,

> The Green Dragons was a violent gang that operated principally in the predominantly Chinese sections of Elmhurst and Flushing in Queens, New York. The members primarily extorted "protection" money from Chinese-run businesses, but also engaged in periodic armed robberies. They frequently employed violence to defend and expand their turf, assaulting, kidnapping, and murdering rival gang members, potential witnesses, and businessmen who refused to pay protection money. The gang amassed a sizeable arsenal of firearms with which to conduct its criminal activities.

Wong, 40 F.3d at 1355. Wong's involvement in the gang's activities was principally in his collecting extortion payments from restaurants in Queens, in the course of which he, together with co-defendant Joseph Wang, shot to death the manager of the Tien Chiau Restaurant in Queens and a patron at the restaurant; he thereafter sought to kill witnesses to the robbery/murder. See Wong, 40 F.3d at 1374.

### II. The Sentencing

Judge Raggi found that Wong's offense level under the United States Sentencing Guidelines was 45 in Criminal History Category II, which required a life term of imprisonment. (T 72).[2] Wong was sentenced on October 2, 1992, see DE 68, 70; see also excerpts from transcript of proceedings, attached hereto, well prior to the time at which the Guidelines were rendered advisory by the Supreme Court's decision in United States v.

---

[2] "T" followed by numerals refers to pagination in the sentencing transcript, pertinent portions of which are attached.

Booker, 543 U.S. 220 (2005). As noted above, he was sentenced to life terms on the counts here at issue.

III. The Collateral Attacks

Following the affirmance of his judgment of conviction and the denial of his petition for certiorari, see Wong v. United States, 516 U.S. 870 (Oct. 2, 1995), Wong filed a motion under 28 U.S.C. § 2255. See Wong v. United States, 98 CV 1356 (RR). This motion was denied by Judge Raggi in an order entered August 25, 1998. Leave to appeal was denied by order of the Court of Appeals dated November 29, 1999. See Wong v. United States, No. 98-2847.

By motion filed in this Court on October 22, 2012, Wong sought relief under Section 2255 based on Miller. He asserted that his petition was not barred by the restrictions in 28 U.S.C. § 2244 against successive motions and that he was entitled to resentencing because he was a juvenile at the time of the commission of his offenses. DE 1. By order entered December 14, 2012, the motion was transferred to the Court of Appeals as a successive motion. DE 3.

IV. The Motion for Leave to File a Successive Motion

In an April 30, 2013 motion, Wong sought leave of the Court of Appeals to file a successive motion in this Court under Section 2255, based upon Miller. See Wong v. United States, No. 13-1670, DE 2. After initially denying the motion in a May 29, 2013 order, the Court of Appeals, by order dated September 26, 2013, granted Wong leave "to file a § 2255 motion raising his proposed claim based on Miller v. Alabama, 132 S. Ct. 2455 (2012)," although it directed this Court "to address whether the United States Supreme Court's

decision in Miller announced a new rule of constitutional law made retroactive to cases on collateral review," citing Quezada v. Smith, 624 F.3d 514, 521-22 (2d Cir. 2010), and Bell v. United States, 296 F.3d 127, 128 (2d Cir. 2002) ("the prima facie standard [applies to] our consideration of successive habeas applications under § 2255.").

ARGUMENT

BECAUSE MILLER IS RETROACTIVE TO CASES ON COLLATERAL REVIEW AND APPLIES TO MANDATORY GUIDELINES DETERMINATIONS, THE COURT ERRED IN SENTENCING WONG UNDER A GUIDELINE MANDATING A LIFE TERM OF IMPRISONMENT AND HE SHOULD THEREFORE BE RESENTENCED

As we noted above, Wong's motion presents the issues of whether Miller v. Alabama, 132 S. Ct. 3455 (2012), is retroactive to cases, such as this, on collateral review, whether it applies to life terms under the Guidelines as opposed to those mandated by statute, and whether a claim under Miller may be brought in a second or successive motion under 28 U.S.C. § 2255. As we show below, Miller does apply retroactively, it also applies to Guideline-mandated sentences, and a claim under Miller may be brought in a second or successive motion.

I. Miller Applies Retroactively to Cases on Collateral Review

In Miller, the Supreme Court held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments." Miller, 132 S. Ct. at 2460. The Court noted that "[t]he mandatory penalty schemes at issue here . . . prevent the sentencer from considering youth and from assessing whether the law's harshest punishment proportionately punishes a juvenile offender." Id. at 2458. Although a juvenile who commits a homicide may be sentenced to life without parole, id. at 2469, the sentencer for such a juvenile offense must have "discretion to impose a different punishment," id. at 2460.

While, under Miller, a defendant could not be sentenced today to a mandatory term of life imprisonment, the issue at this point -- with Wong's conviction having become

final with the denial of certiorari years ago -- is whether Miller applies retroactively to cases on collateral review. See, e.g., Guzman v. United States, 404 F.3d 139, 140-41 (2d Cir. 2005) (final judgment is subject to collateral attack based on subsequent Supreme Court constitutional decision only if decision applies retroactively). "Under the analysis set forth in Teague v. Lane, 489 U.S. 288 . . . (1989) (plurality opinion), and, as later developed, a new rule of constitutional law does not apply retroactively to cases on collateral review unless the rule is substantive or a 'watershed' rule of criminal procedure that affects 'the fundamental fairness and accuracy of the criminal proceeding.' Schriro v. Summerlin, . . . 124 S.Ct. 2519 . . . (2004) (quotation omitted)." Guzman, 404 F.3d at 141.

Miller's rule of constitutional law -- that the Constitution forbids a mandatory life-without-parole sentence for a juvenile offender -- is "new," in that no prior Supreme Court decisions dictated that holding. Whether it has been made retroactive to cases on collateral review turns on the nature of Miller's rule. While under Teague's retroactivity principles, new *procedural* rules are not retroactive to cases on collateral review, new *substantive* rules, the Supreme Court has established, are retroactively applicable, see Bousley v. United States, 523 U.S. 614, 620 (1998).

As we show below, Miller's holding that juvenile defendants cannot be subjected to a mandatory life-without-parole sentence is properly regarded as a substantive rule. Miller does not simply alter sentencing procedures; rather, it expands the range of possible sentencing outcomes for a category of defendants by requiring that the sentencer have the option of imposing a lesser sentence.

A.   Miller Announced a New Rule

Wong correctly argues that Miller announced a "new" rule under Teague.   See Motion at 4-6.   A rule is "new" if it was not "dictated by precedent existing at the time the defendant's conviction became final."   Teague, 489 U.S. at 301; see Graham v. Collins, 506 U.S. 461, 467 (1993).

Miller's holding that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders," 132 S. Ct. at 2469, was not "dictated" by existing precedent.   The Miller Court reached its holding by extending and combining "two strands of precedent."   132 S. Ct. at 2463.   As Miller explained, the first line of precedent "adopted categorical bans" on sentences that were excessively severe for a class of offenders.   Id.; see, e.g., Kennedy v. Louisiana, 554 U.S. 407 (2008); Atkins v. Virginia, 536 U.S. 304 (2002).   Two such cases, the Court noted, involved juvenile offenders. See Roper v. Simmons, 543 U.S. 551 (2005) (categorical ban on capital punishment); Graham v. Florida, 130 S. Ct. 2011 (2010) (categorical ban on life-without-parole sentence for a non-homicide offense).   The Graham Court had limited its holding to non-homicide offenses, reasoning that offenders who were both juvenile and who lacked intent to kill had "twice diminished moral culpability."   Id. at 2027.   Observing that Graham had compared a juvenile life-without-parole sentence to the death penalty, however, Miller turned to a second line of precedent, decisions "prohibit[ing] mandatory imposition of capital punishment" without consideration of the characteristics of the defendant and his offense.   Miller, 132 S. Ct. at 2463-64 (citing Woodson v. North Carolina, 428 U.S. 280 (1976) (plurality opinion)).   The Woodson line of decisions rested on the premise that "death is a punishment different from all

other sanctions in kind rather than degree" and, therefore, "in capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense."   428 U.S. at 303-04.

      Miller extended the first line of precedent -- the Roper-Graham line of decisions -- to conclude that juveniles are "constitutionally different" for sentencing purposes, even when, unlike in Graham, they commit homicide.   132 S. Ct. at 2464 (stating that Graham's reasoning "implicates" all life-without-parole sentences imposed on juveniles, even though Graham "relate[d] only to non-homicide offenses").   Miller then extended the second line of precedent -- the Woodson line of decisions -- beyond its death-penalty context to hold that juveniles may not be subject to mandatory life-without-parole sentences and that the sentencer must consider the characteristics of juvenile defendants before imposing such a sentence.   Id. at 2467.   Rather than being dictated by precedent, then, Miller's holding rested on the Supreme Court's extension of existing decisions beyond the limits expressed in those decisions.   Id. at 2464 (noting that "confluence" of lines of precedent "leads to" the Court's conclusion, not that the conclusion was dictated by prior decisions).   Because reasonable jurists considering Wang's conviction at the time it became final could have concluded that then-existing precedent, including Woodson, did not establish the unconstitutionality of mandatory life-without-parole sentences for juveniles who committed homicide, Miller announced a new rule that was not dictated by precedent.   See O'Dell v. Netherland, 521 U.S. 151, 156 (1997).

B.    The New Rule Announced in Miller Is Substantive

Wong also correctly argues that the rule announced in Miller is substantive.
See Motion at 4.

Under Teague, new rules of criminal procedure do not apply retroactively on
collateral review of already-final convictions unless they constitute "watershed rules of
criminal procedure."  Teague, 489 U.S. at 311.  The Supreme Court has held, however, that
substantive rules, unlike procedural rules, are not subject to Teague at all and that they
necessarily apply retroactively on collateral review.  See Beard v. Banks, 542 U.S. 406, 411
n.3 (2004) ("Rules that fall within what we have referred to as Teague's first exception 'are
more accurately characterized as substantive rules not subject to [Teague's] bar.'").  As the
Court has explained, "Teague by its terms applies only to procedural rules."  Bousley, 523
U.S. at 620.  Because the rule announced in Miller is not solely about procedure but instead
also alters the range of sentencing options for a juvenile homicide defendant, it is properly
regarded as "substantive" for Teague purposes and therefore applies retroactively to Wang's
conviction.

1.    The divide between substantive and procedural rules, as it has evolved in the
Supreme Court's decisions, reflects the fundamental difference between the way a case is
adjudicated (procedure) and the possible outcomes of the case (substance).  Originally,
Teague borrowed from Justice Harlan's formulation to describe "substantive rules," which
should be applied retroactively, as those that placed certain primary conduct beyond the reach
of the criminal law.  489 U.S. at 307 (citing Mackey v. United States, 401 U.S. 667, 692
(1971) (Harlan, J., concurring)).  The Court subsequently expanded the category to include

decisions categorically precluding a particular type of punishment or protecting a particular class of persons from such punishment.   See Penry v. Lynaugh, 492 U.S. 302, 329-330 (1989) ("[A] new rule placing a certain class of individuals beyond the State's power to punish by death is analogous to a new rule placing certain conduct beyond the State's power to punish at all.").   The Court thus summarized that Teague's bar on retroactive application does not extend to "a substantive categorical guarante[e] accorded by the Constitution, such as a rule prohibiting a certain category of punishment for a class of defendants because of their status or offense."   Saffle v. Parks, 494 U.S. 484, 494 (1990) (citation and internal quotation marks omitted; brackets in original).   The Court again expanded the class of substantive rules in Bousley, 523 U.S. at 620-21, holding that Teague does not apply to changes in the substantive scope of a criminal statute that have the effect of placing certain conduct outside of the reach of the law.   Thus, "[n]ew *substantive* rules . . .   include[] decisions that narrow the scope of a criminal statute by interpreting its terms," as well as decisions "that place particular conduct or persons covered by the statute beyond the State's power to punish."   Schriro v. Summerlin, 542 U.S. 348, 351-52 (2004).

Under this analysis, substantive rules affect the range of permissible *outcomes* of the criminal process and procedural rules govern the *manner* of determining those outcomes.   To date, the new rules the Court has treated as substantive have categorically prohibited a particular outcome for a particular class of defendants, regardless of the procedure employed.   See Summerlin, 542 U.S. at 352 (citing Bousley; Saffle).   But while the category of substantive rules "includes" such rules, 542 U.S. at 351, it is not limited to them.   See also Danforth v. Minnesota, 552 U.S. 264, 278 (2008) (Teague is grounded in the authority of the

courts "to adjust the scope of the writ in accordance with equitable and prudential considerations"). And the category of rules treated as "procedural," and thus not retroactive, has "regulate[d] only the *manner of determining* the defendant's culpability." Summerlin, 542 U.S. at 353 (emphasis in original). Such rules "do not produce a class of persons convicted of conduct the law does not make criminal, but merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise," which, the Court stated, is a possibility too "speculative" to warrant retroactivity. Summerlin, 542 U.S. at 352. Taken together, the Court's descriptions of "substantive" and "procedural" rules under Teague produce the conclusion that rules that go beyond regulating only the manner of determining culpability -- and instead categorically change the range of outcomes -- should be treated as substantive rules.

2. The Miller rule, which holds that a juvenile defendant may not be subject to mandatory life without parole but instead must be given the opportunity to demonstrate that a lesser sentence is appropriate, see 132 S. Ct. at 2469, categorically expands the range of permissible outcomes of the criminal proceeding. It is therefore a substantive rule.

Miller is not solely about the procedures that must be employed in considering the range of sentencing options. Rather, Miller changes the range of outcomes that a juvenile defendant faces for a homicide offense. A jurisdiction that mandates life without parole for juveniles convicted of homicide permits only one sentencing outcome. Miller invalidates such regimes and requires a range of outcomes that includes the possibility of a lesser sentence than life. That is a substantive change in the law, not solely a procedural one. The Miller rule does not "regulate only the *manner of determining* the defendant's culpability."

Summerlin, 542 U.S. at 353 (emphasis in original).   Instead, the Miller rule gives juvenile

defendants the opportunity to obtain a different and more favorable outcome than was possible

before Miller.

    By contrast, the decisions that the Supreme Court has classified as procedural

have altered only the process used to determine a defendant's culpability without expanding or

narrowing the range of possible outcomes of the criminal process.   In Summerlin, for

instance, the Court emphasized that its holding in Ring v. Arizona, 536 U.S. 584 (2002), that a

sentencing judge may not make the aggravating findings that subject a defendant to the death

penalty, did not "alter the range of conduct Arizona law subjected to the death penalty."

Summerlin, 542 U.S. at 353.   "Instead, Ring altered the range of permissible methods for

determining whether a defendant's conduct is punishable by death."   Id.; see also Saffle, 494

U.S. at 486, 495 (rule concerning the permissibility of instructing the jury not to rely on

sympathy for the defendant was procedural; range of outcomes continued to include death or a

less severe sentence); Graham v. Collins, 506 U.S. at 477 (rule concerning the manner in

which a sentencing jury considered mitigating evidence was procedural; range of outcomes

continued to include death or a less severe sentence).   Unlike these decisions, Miller does not

simply address the "manner of determining" a defendant's culpability; instead, it expands the

range of outcomes of the criminal proceeding beyond that permitted by mandatory

life-without-parole statutes.   It requires that juvenile defendants must have the opportunity to

establish that life without parole is not an appropriate sentence.   It is therefore a substantive

rule.

    Miller does differ from previous decisions announcing substantive rules, all of

which narrowed, rather than expanded, the range of permissible outcomes of the criminal process by prohibiting a particular outcome for a category of defendants.   See, e.g., Graham, 130 S. Ct. at 2031; Roper, 543 U.S. at 568-75.   Miller does not categorically hold that juvenile defendants may never be sentenced to life without parole for a homicide offense; instead, it requires the sentencer to take into account "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison," before such a sentence may be imposed.   132 S. Ct. at 2469.   Thus, Miller stated that its holding "does not categorically bar a penalty for a class of offenders or type of crime" but instead "mandates only that a sentencer follow a certain process -- considering an offender's youth and attendant characteristics -- before imposing a particular penalty."   Id. at 2471.   In that respect, Miller does have a procedural component.

Nothing, however, in Miller implies that the Court viewed its decision as principally procedural, and its holding makes clear that it is not.   By mandating that a juvenile defendant's characteristics be taken into account at sentencing, the Court also mandated that new and more favorable potential outcomes be made available to defendants who previously had faced only one possible outcome: life without parole.   See Miller, 132 S. Ct. at 2469. This is not akin to a procedural rule that simply requires admission of a class of evidence or changing the factfinder from judge to jury.   It requires that new sentencing options be available.   Moreover, the Court did not suggest that its alteration of the range of options available for a sentencer would have only the "speculative" effect on outcomes of most procedural rules.   Summerlin, 542 U.S. at 352.   Rather, it stated that "we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon."   132

S. Ct. at 2469. Certainly, the government may still contend that a life-without-parole sentence should be imposed on a juvenile convicted of a homicide offense. But Miller categorically mandated that a lesser sentence be available as well.

In only one prior context has the Supreme Court invalidated a particular severe sentence as unconstitutional because of its mandatory character, the imposition of mandatory capital punishment. See Woodson; Roberts v. Louisiana, 428 U.S. 325 (1976); Sumner v. Shuman, 483 U.S. 66 (1987). In conclusively ending mandatory death sentences, the Court refused to countenance "a departure from the individualized capital-sentencing doctrine" it had adopted, even for murder by life-term inmates. Sumner, 483 U.S. at 78. The Court never had the opportunity to consider whether the Woodson principle was retroactive under Teague because it amounted to a substantive rule. When the Court granted habeas relief in Sumner, only three individuals in the United States appear to have been under mandatory death sentences, see id. at 72 n.2, and Teague lay 20 months in the future.[3] But it seems unlikely that non-retroactivity grounds would have been used to deny habeas relief for a capital defendant who never had *any* opportunity to ask a sentencer to impose a lesser sentence.

Like Miller, Woodson has a procedural component. See Woodson, 428 U.S. at 305 n.40 (plurality opinion) ("[T]he death sentences in this case were imposed under procedures that violated constitutional standards."). But Woodson, like Miller, also does much more. By requiring individualized consideration before imposing the harshest penalty

[3] Until Miller, no other case had extended Woodson. In light of the Supreme Court's holdings in Harmelin v. Michigan, 501 U.S. 957 (1991) (rejecting Eighth Amendment challenge to mandatory life-without-parole sentence for possession of 650 grams or more of cocaine), and Chapman v. United States, 500 U.S. 453, 467 (1991) ("Congress has the power to define criminal punishments without giving the courts any sentencing discretion."), it seems highly unlikely that Woodson will be extended further.

available by law, each decision expanded the sentencing options that must be made available to the sentencer, i.e., each case changed the substance of the sentencing decision by requiring that a less-harsh sentence be available. And the execution of an individual who had no opportunity to seek a lesser sentence would completely violate the principle of "individualized sentencing" (Sumner, 483 U.S. at 75) that lay at the heart of Woodson. Miller rests on the same principle of "individualized sentencing" as Woodson: a court may not impose the "harshest possible penalty for juveniles" without the juvenile's having an opportunity to ask for a lesser sentence. Miller, 132 S. Ct. at 2460, 2464 n.4, 2466 n.6, 2475. Just as Woodson changed the substance of capital sentencing, Miller's fundamental change in the law should similarly be regarded as substantive under Teague.[4]

## II. Miller Applies to Guideline-Mandated Life Sentences

The Miller holding that a life term of imprisonment without the possibility of parole for a juvenile violates the Eighth Amendment where it is mandated by law. See Miller, 132 S. Ct. at 2464 ("[M]andatory life-without parole sentences for juveniles violate the Eighth Amendment."). In Miller, the Alabama statutory sentencing scheme required the life minimum term. See id. at 2463. Here, however, Wong's crimes did not require a life term under the applicable statutes. Wong does not address this distinction.

However, because Wong's offenses and sentencing took place during a regime of mandatory Sentencing Guidelines under which youth could not be considered in imposing

---

[4] The circuits are split as to whether, for gatekeeping purposes, Miller is retroactive to cases on collateral review. Compare Johnson v. United States, 720 F.3d 720 (8th Cir. 2013) (per curiam) (Miller retroactive), and Evans-Garcia v. United States, 744 F.3d 235 (1st Cir. 2014) (same), with In re Morgan, 713 F.3d 1365 (11th Cir. 2013) (not retroactive); Craig v. Cain, 2013 WL 69128 (5th Cir. Jan. 4, 2013) (per curiam) (same) .

sentence, we consider them the functional equivalent of the statutorily-required life term in Miller. In the Second Circuit, youthful lack of guidance, for example, was long a prohibited ground for departure, as it was at the time of Wong's offenses. See United States v. Haynes, 983 F.2d 645, 68-69 (2d Cir. 1993). Under Miller, this factor should have been accorded consideration unencumbered by a mandatory Guideline.

We do observe that Judge Raggi, recognizing the general authority to depart under the Guidelines, indicated that she was considering the defendant's youth in imposing sentence (T 71) and that, in effect, she would have sentenced him to a life term regardless of the Guidelines (T 72). However, because the constitutionally-significant differences between adults and juveniles as set forth in Miller had not been established as of the time of Wong's sentencing, we do not argue that the Miller error was harmless, although the issue is close. See, e.g., United States v. Crosby, 397 F.3d 103, 118 (2d Cir. 2005) ("[E]ven if a judge, prior to [United States v. Booker, 543 U.S. 220 (2005),] indicated an alternative sentence that would have been imposed if compliance with the Guidelines were not required, that alternative sentence is not necessarily the same one that the judge would have imposed in compliance with the duty to consider all of the factors listed in section 3553(a). In addition, such an alternative sentence is not necessarily the same one that the judge would have imposed after presentation by the Government of aggravating circumstances or by the defendant of mitigating circumstances that existed at the time but were not available for consideration under the mandatory Guidelines regime.") (footnotes omitted).

## III. A Miller Claim Can Be Brought in a Second Section 2255 Motion

While we show above that Miller announced a new rule of constitutional law

that is retroactive to cases on collateral review, the Court of Appeals' order, as noted, calls for a determination of the closely-related question of whether the rule announced in Miller meets the gatekeeping requirements of 28 U.S.C. § 2244(b)(2)(A), that is, that "the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." See Bennett v. United States, 119 F.3d 468, 469-70 (7th Cir. 1997) (a court of appeals' granting of an application to file a successive motion is "tentative in the following sense: the district court must dismiss the motion that we have allowed the applicant to file, without reaching the merits of the motion, if the court finds that the movant has not satisfied the requirements for the filing of such a motion" and that "[t]he movant must get through two gates before the merits of the motion can be considered."). In addition to demonstrating that the new rule is retroactive under Teague, then, the movant must show that the new rule was made retroactive by the Supreme Court. See Tyler v. Cain, 533 U.S. 656, 666 (2001) (Supreme Court may make a new constitutional rule retroactive to cases on collateral review by explicitly so stating in the decision announcing the new rule, or it may "make a rule retroactive over the course of two case . . . with the right combination of holdings."). Here, for the reasons set forth above, the combination of holdings leading to Miller shows that the Supreme Court has, by this manner, made Miller retroactive.

CONCLUSION

For the reasons set forth above, the motion under 28 U.S.C. § 2255 should be granted and Wong should be resentenced.

Dated: Brooklyn, New York
May 19, 2014

Respectfully submitted,

LORETTA E. LYNCH,
United States Attorney,
Eastern District of New York.

By: /s/
Peter A. Norling
Assistant U.S. Attorney

PETER A. NORLING,
Assistant U.S. Attorney,
(Of Counsel).

A T T A C H M E N T

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------x

UNITED STATES OF AMERICA

-vs-

CHEN I. CHUNG, et. al.,

Defendants

--------------------------x

DOCKET NO.: CR-90-1019
Brooklyn, New York
October 2, 1992
10:00 a.m.

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING

BEFORE THE HONORABLE REENA RAGGI
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Government: CATHERINE PALMER, ESQ.
LORETTA LYNCH, ESQ.
U.S. Attorney's Office
225 Cadman Plaza East
Brooklyn, NY 11201

For the Defendants

Chung: MICHAEL HANDWERKER, ESQ.
60 Hudson Street
New York, NY 10013

Audio Operator: Jeffrey Howell

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

PARSLEY ASSOCIATES INC.
328 Flatbush Avenue, Suite 251
Brooklyn, NY 11238

K. Rusin

ADDITIONAL APPEARANCES:

For the Defendants

Tran: SUSAN KELLMAN, ESQ.
225 Broadway, Suite 2100
New York, NY 10007

Kwok: ALAN DREZIN, ESQ.
26 Court Street, Suite 1600
Brooklyn, NY 11242

Wong: LLOYD EPSTEIN, ESQ.
Epstein & Weil
225 Broadway
New York, NY

Wang: MICHAEL PADDEN, ESQ.
Federal Defenders
50 Court Street, Suite 1103
Brooklyn, NY 11201

Cheng: CHARLES LEVINE, ESQ.
108-18 Queens Boulevard
Forest Hills, NY

Chan: LAWRENCE SCHOENBACH, ESQ.
425 Park Avenue, 26th floor
New York, NY 10022

Ngo: GERALD E. BODELL, ESQ.
Chrysler Building, Suite 3300
405 Lexington Avenue
New York, NY 10174

Counsel, do you want to note your appearance formally for the record?

MR. EPSTEIN: Yes, Your Honor. Lloyd Epstein, Epstein & Weil, 225 Broadway, New York, New York.

THE COURT: All right. Mr. Epstein, I have had a chance to review the presentence report, your submission and the Government's response of September 30th. Have you had a chance to see all of these documents and to go over them with your client?

MR. EPSTEIN: Your Honor, I have seen the documents. I have reviewed them. I reviewed my submissions and the probation report with my client. As you may note from the date on the Government's response, I received it yesterday afternoon at approximately 1:30. I did have a conversation with my client about it over the telephone in which we discussed basically the downward departure issues that were raised. We didn't discuss the technical details about the guideline calculations, in fact, but however the Court rules on them it will not affect the guideline calculations.

THE COURT: Do you need some more time, because I can take Mr. Wang first if you want to talk to your client for a few moments.

MR. EPSTEIN: I'd like to have a few moments, Your Honor.

THE COURT: All right, take some time. I'll deal

with Mr. Wang's sentencing first.

MR. PADDEN: Your Honor, I don't mean to cut you short, but we're in essentially the same position in terms of receiving the submissions of the Government. I have synopsized them for my client, but we want to just take a couple of minutes to --

THE COURT: Sure. We'll take --

MR. PADDEN: -- avoid that problem here.

THE COURT: -- ten minutes, and then proceed. Marshals, can the defendants stay with their lawyers here in court just to go over this material? Thanks.

(tape off/tape on)

THE COURT: Mr. Epstein, are we ready to proceed with your client?

MR. EPSTEIN: Yes, Your Honor.

THE COURT: Mr. Epstein, you have now had a chance to review the presentence report and the Government's letter with your client?

MR. EPSTEIN: Yes, we have, Your Honor.

THE COURT: Mr. Wong, you have seen the presentence report in your case and the Government's letter?

THE DEFENDANT WONG: Yes, I have.

THE COURT: All right. I noted from your letter, Mr. Epstein, that you raise no factual challenge. Rather, you urge me to consider the guidelines not applicable in this

case, for a variety of reasons, citing Judge Weinstein's recent decision in Concepcion. Before I discuss that matter, am I right that there are no factual objections?

MR. EPSTEIN: That's correct, Your Honor.

THE COURT: Let's deal with the question of guideline applicability in this case. Is there anything further you want to add to your written submission in this regard?

MR. EPSTEIN: Not really, Your Honor. I think what I focus on there is the atypical nature of this case, that the guidelines, it appears to me, were not designed to deal with, you know, the nightmare situation of teenagers running wild and the possibility of a person who is 17 years old at the time of a homicide actually facing life imprisonment. Usually, the RICO guidelines and the homicide guidelines deal with people who have severe pathological motives, and in terms of RICO, people who have led a life of crime, and certainly although Mr. Wong's involvement with crime was very intensive during a period of his life, two years, it seems to me that's significantly different from what was intended by the guidelines.

In addition, Your Honor, I have many arguments to make about why Mr. Wong himself is atypical, even of the people involved in this type of organization, that --

THE COURT: And those you've argued primarily in

urging departure --

MR. EPSTEIN: Correct.

THE COURT: -- if I were to apply the guidelines.

MR. EPSTEIN: That's correct, Your Honor, but it seems to me that taking Judge Weinstein's opinion in the broadest sense, and given that it was approved, at least in spirit, by the Second Circuit, it seems to me that the arguments tend to flow one into the other.

THE COURT: All right. I have given careful consideration to the propriety of applying the guidelines in this case to Mr. Wong specifically, to all of the defendants generally. It is a difficult question when the Court is confronted with so many young people who before reaching even their 21st birthday are capable of such violent crimes. But I do think that the guidelines are meant to focus primarily on the criminal conduct.

To the extent that the defendants' youth should play any part here, I recognize the guidelines say that youth is -- or age is generally not a factor, but I have weighed it in considering each and every defendant in this case. It has sometimes made the decision to impose lengthy sentences difficult for the Court, as I noted a moment ago when I sentenced Mr. Kwok, but I have balanced against it the terrible, terrible crimes committed.

Certainly, Mr. Wong is charged with one of the most

terrible scenarios to have come out in the course of the trial, the murder of Mr. Galavan and Mr. Ting, along with the wounding of Mr. Hyde and another individual -- is it Mr. Chen who was also wounded?

MS. PALMER: Mr. Chen, yes.

THE COURT: Under these circumstances, I would find that even though there is a principled argument for not applying the guidelines in all cases as outlined by Judge Weinstein in Concepcion, that this is not a case where I think that justice warrants a sentence outside the guidelines, and so I am going to apply the guidelines in the case. Now, calculating the guidelines in Mr. Wong's case, I would have to find that there was a total offense level of 45. With a criminal history category of two, he faces a life term of imprisonment, a three to five year term of supervised release, a $25,000 to $250,000 fine and a $150 order of special assessment, $50 on each of the three counts of conviction.

Mr. Epstein, is there any challenge to that being an accurate guideline calculation given the facts of the case?

MR. EPSTEIN: No.

THE COURT: All right. If you and Mr. Wong would step forward, I'll be happy to hear you on the departure motion. [Pause] All right, let me hear you with respect to departure, Mr. Epstein. I note that you urge that I consider his lack of youthful guidance, his age and the strong

potential for rehabilitation that I should see in him.

MR. EPSTEIN: That's correct, Your Honor. I would like to open my argument by noting that the arguments I make are not really generic arguments, that unlike some of the other defendants' counsel were seeking time for a psychiatric report, I think I presented one to the Court by a very reputable psychiatrist, --

THE COURT: Yes.

MR. EPSTEIN: -- who has done considerable work with victims and other people who have been -- had trauma in their life, and I believe that he raised very substantial issues concerning Mr. Wong's potential for rehabilitation. I'd also note that Mr. Wong's family is in the courtroom, that he has reached out to them over the past few weeks, and he has had considerable contact with them over the time -- and I believe that also tells you something about the direction that we might expect from Mr. Wong in the future.

Now, even though I am going to talk about rehabilitation, this is not meant, really, to minimize in any way the nature of Mr. Wong's crime or to any way suggest that the Court should not impose extremely severe punishment, that in the letter I wrote to the Court last month, I suggested that an appropriate sentence would probably be in the area of 25 years, and that's hardly the type of punishment that the Government describes as warranted for a defendant who is

attempting to avoid punishment in the case.

I mean, if Mr. Wong is sentenced to a sentence in the area of 25 years, he'll be 45 years old, 46 years old at the time that he is released. I think it's very difficult not to -- you know, for someone who is in my position not to appreciate the severity of that. I am a little less than 40 right now, and Mr. Wong would be far older than I am before he ever would see the streets again, if the Court were to impose that type of sentence.

What I think is important to note in Mr. Wong's life over the last year or so is that whenever there have been moments that he has been free from the other members of the gang, he has consistently made efforts to reach out and form more appropriate types of social relationships, that when he was at Riker's Island, for instance, he reached out to a social worker there named Burt May, with whom he formed a fairly strong therapeutic relationship.

Our psychiatrist, Dr. Kleinman, interviewed Mr. May and confirmed more or less what Mr. Wong had stated, that Mr. Wong had reached out to Mr. May, and that Mr. May, who deals with -- solely deals with prisoners, found Mr. Wong to be much more receptive to treatment, much more receptive to rehabilitation than almost anyone that he had seen during --

THE COURT: Mr. Epstein, let me interrupt you just to ask you how I consider that in light of the fact that the

Government has now submitted tapes that suggest to me that, at the same time, Mr. Wong was talking about using his psychiatric counseling to his advantage in his court proceeding, and that during that same period is when he's talking in truly disturbing terms about killing Carol Wong, the witness to the crime?

MR. EPSTEIN: I think those are two separate issues, and I'd like to address them --

THE COURT: Please.

MR. EPSTEIN: -- separately. Firstly, Your Honor, I feel I was somewhat remiss in not pulling the tapes out of the discovery material, because you know, I came in really to do the appeal in this case, and I had gone over all of the tapes that were introduced at trial, but in fact, if I had seen that tape before, I would have sent it myself to the Court, because it seems to me that the Government's characterization of that as an effort by Mr. Wong to subvert the criminal justice system is really off base, that if you look at the transcript closely -- and I recognize the Court may not have had an opportunity to do so, since I take it the Court received it yesterday afternoon, at the moment it was sent to me.

THE COURT: But I have read all of the submissions carefully. I spent a good part of yesterday doing this in order to be prepared today.

MR. EPSTEIN: Well, then I'll focus in on some of

the details, that if you'll notice, Mr. Wong is in a conversation with Sonny Wong, and that Mr. Wong mentions that he has gone for psychiatric help and the reason why he's gone for psychiatric help is because he's depressed and he wants somebody to preach to him, that he specifically told the person, Mr. May, that he was not crazy, that he was not suffering from any type of mental disability, but he wanted someone to talk to.

It's Mr. Wong, Sonny Wong, who introduces the notion that this can somehow be useful in the case, and for sure, --

THE COURT: But then almost right away your client says that's what I'm trying to do, like, you know, my father passed away, you know, my family -- it's not like he needs Mr. Wong to give him the script.

MR. EPSTEIN: Well, Your Honor, it seems to me that this is perfectly consistent with the type of behavior that Mr. Wong has exhibited throughout his existence with the Green Dragons, that when he is with the Green Dragons, he's significantly different than he is when he's alone. I have to say that I observed that myself coming into this case rather late, and when I observed my client in the pens, there was one type of behavior, and I think there was sort of a macho front that has to be put on.

When he's alone with me, he seems to be very, very different, and it seems to me, Your Honor, that it was Mr.

Wong's position that he wanted somebody to preach to him, that he wanted someone to talk to him. The fact that when he speaks to Sonny Wong he says something a little bit different is not at all inconsistent. In fact, it fits with the profile, and it fits with the prescription of rehabilitation that Dr. Kleinman gives, which really includes his complete isolation from anyone involved in the gang. I would add, Your Honor, --

THE COURT: Where can that be achieved, except in prison?

MR. EPSTEIN: I'm not suggesting that he shouldn't be incarcerated, Your Honor. I opened my argument by saying that at least in my view, a sentence in the area of 25 years would be appropriate.

THE COURT: All right.

MR. EPSTEIN: So it seems to me that -- and I don't want to minimize the nature of the crime, but the statute and the guidelines do authorize the Court, and in fact, encourage and perhaps compel the Court to consider other factors as well, and it's within the context of Mr. Wong facing a life sentence under the guidelines that I'm making all of these arguments.

I mean, certainly, Your Honor, if there was any evidence that Mr. Wong was attempting to manipulate his meetings with Burt May, that could have been adduced in terms

of subpoenaing Mr. May's records, in terms of interviewing Mr. May, in terms of bringing Mr. May into court. Now, I will say that we did speak to Mr. May. I spoke to him. Dr. Kleinman spoke to him.

There has been some difficulty in obtaining Mr. May's records, that I issued a subpoena and I know that Mr. Hill of the probation department issued a subpoena, and he expects the records to arrive within several days. I didn't press the issue of the subpoena since it wasn't until yesterday afternoon that I learned the people were going to make an issue of what exactly the nature was of Mr. Wong's relationship with Mr. May, and if the Court feels that that really is a substantial issue, you know, I would ask the Court to postpone sentencing just for a few days.

THE COURT: I don't think it's necessary.

MR. EPSTEIN: I don't think it's necessary either, because I think a close review of the tape indicates that the arguments raised, you know, by the Government over here are really quite insubstantial, that Mr. May is somebody who regularly deals with people in Mr. Wong's position. He's somebody -- and I think from all of our experience, all of us, you know, who deal regularly with people in the criminal justice system -- I know from my own experience, where I spent several years with the Legal Aid Society, and on the CJA panel, that there is a certain cynicism that comes upon us.

And certainly, people like Mr. May, who are keenly aware that people are trying to manipulate them, are very well trained in making judgments in this area. And it seems to me that if the Government really believes that Mr. Wong was trying to subvert the criminal justice system, then they could bring in Mr. May. They could bring in his reports, but I don't think they'll make any effort to do so because I believe that as one tape indicates, Mr. Wong wanted somebody to preach to him.

Now, as far as the Carol Wang incident is concerned, again, I'm not going to minimize that at all, and I'm not going to try to, you know, force the fantasy on the Court that Mr. Wong has undergone any type of jailhouse conversion, that he's been rehabilitated already and that the Court should therefore impose a very light sentence. I think that would be, if nothing else, degrading to the Court. It would be degrading to the bar for me to make any type of argument like that.

If you'll note what Dr. Kleinman says, that Mr. Wong is a very torn personality, that he's somebody who experienced dissonance, he experienced some discomfort with what he did, did it prevent him? No. He didn't have that type of conscience and super ego sufficiently developed that it would stop him from doing things. Therefore, Dr. Kleinman recommends intensive psychotherapy over a period of ten or 15

years, because he feels this will complete a rehabilitation process. Has it started? I believe it has started, but I think it would be fanciful, and I really wouldn't -- really, it would distort my argument to say that Mr. Wong has been completely rehabilitated now, much less back in 1990 when he was dealing with Carol Wang.

I would say that, you know, like many teenagers, he was proceeding in different directions at the same time, and it seems to me that it would be unrealistic to view his conduct in any other way. In addition, Your Honor, the Government makes a big deal out of the fact that Mr. Wong maybe even now thinks that he's using the psychiatric reports to better his position. Now, to a certain degree, it would seem to me that we'd be imposing or at least imputing a degree of naivete to any defendant -- you know, if we were going to say that he didn't realize that this might help him in some way before the Court.

Certainly, I explained that to Mr. Wong, and certainly I'm being very -- I think we're being very up front about it, that we believe that the psychiatric report does tell you something about Mr. Wong, that he does have a level of conscience, that he does have a level of decency and a potential for rehabilitation that may well be missing in other places. It seems to me also, Your Honor, that if you look at his behavior since he's been further isolated from the Green

Dragons, that further corroborates at least my view that isolation from the Green Dragons tends to bring out a different side of Mr. Wong's personality.

The Government brought to your attention a complaint that may be filed next week in the Southern District involving an altercation between Mr. Wong and an employee at the MCC. After that occurred, and I don't want to dwell on that to any great length, for obvious reasons, since we may be facing the complaint next week, and I don't think that in the context of the numbers that we're talking about of years or a life sentence that really has all that much significance, but in any event, once he was isolated from the Green Dragons, and placed in a different wing of MCC, his response was to reach out to his family, that he began calling his uncles, that he began calling his aunts, that he began reestablishing a family relationship.

And I can say, Your Honor, this is nothing that I encouraged him to do, since I didn't know Mr. Wong at that time. It was only after his family was contacted that I came into the case, but it seems to me that this is consistent with Mr. Wong's behavior, that when isolated from the Green Dragons he'll exhibit conscience. He'll exhibit a sense of dissonance with his past behavior. And Dr. Kleinman makes it clear that Mr. Wong -- he argued with Mr. Wong about Mr. Wong's past conduct, that Mr. Wong did not attempt to present a front

that, oh, I'm very sorry about everything, everything was bad and now I'll be a good boy -- that Mr. Wong had some real ties to the Green Dragons, some very strong emotional ties, that in many ways the Green Dragons were like an idealized family for him, and those are very difficult ties to break, that I think the Court -- I think all of us have some understanding of those types of ties, if only because at one point we were teenagers.

And certainly this is, in many ways, a perversion of what occurs for teenagers, but one thing that really stands out about Mr. Wong -- and I really can't say whether this is typical of anybody else in the case. You know, I don't know if they have been examined psychiatrically. I certainly haven't been made privy to any reports. But if you read Dr. Kleinman's report closely, what stands out about Mr. Wong is that he, in fact, is an adolescent, that he had adolescent fantasies, that he would feel invulnerable, that he would feel that his family would rescue him at some point.

These are very, very typical of teenagers, that very much what Dr. Kleinman sees -- and Dr. Kleinman is somebody who works in Manhattan criminal courts, and he's regularly dealing with people who may be feigning incompetency for the purpose of avoiding prosecution, you know, that what he saw in Alex was somebody who was really struggling, even right now, to form his identity, and that in many ways, it was a perverse

thing that happened through the Green Dragons. It was a tragic thing that happened through the Green Dragons, but unlike many of the other people, there is some potential here for rehabilitation.

And that within the context of a sentence of 25 years, with a potential, I imagine, since there are three counts, two RICO counts plus one ten year count, of 13 years of supervised release, that the Court can essentially maintain control over Mr. Wong until he's well into his 50s. And it would seem to me that where the guidelines, especially as interpreted by the Second Circuit, strongly encourage the Court to take other factors aside from punishment into account, Mr. Wong stands in a slightly different position from some of the other defendants in the case.

On that basis, Your Honor, I would ask the Court to depart downward, both on the basis of Mr. Wong's lack of youthful guidance and on the basis of his potential for rehabilitation. There's one point I guess I overlooked, and I wanted to talk a little bit about the lack of youthful guidance, that I know the Court focused in with some of the other defendants on whether or not they had been abandoned by their parents.

You'll notice from Dr. Kleinman's report that although Mr. Wong was not abandoned by his father physically, he was abandoned by his mother, and that from a psychological

point of view, certainly, his relationship with his father was virtually nonexistent. His father was outside of the house virtually the whole day. Mr. Wong was completely unsupervised while he was growing up, and at the time that he entered the Green Dragons, certainly, that was the time in which some sort of guidance was clearly the most appropriate. That the Government suggests that this is a weaker case than Floyd for a departure, I would suggest, Your Honor, if anything, it's a stronger case.

We know from contemporary psychology and certainly from a case like this that when teenagers are let loose on their own, as much as teenagers may like to believe that they're free, what results is the worst type of group thing, that even though teenagers may believe that their parents or their teachers or their coaches or their priests or their rabbis are nagging them and intervening, in fact, those are the voices that allow teenagers to experience a little freedom to understand their different points of view and to eventually come to decisions by themselves.

Now, I'm not suggesting that Mr. Wong did not voluntarily involve himself in this, but what I'm saying is that you don't see in Mr. Wong the same type of deep seated pathology that I know this Court has seen in many other cases, you know, where people are consistently sadistic, vicious and where their actions are completely inexplicable. I don't mean

to say that we can explain Mr. Wong's actions, justify them. Just again, I urge the Court to impose a lengthy prison sentence, but something short of life.

What I am saying is that the consideration of rehabilitation, the fact that Mr. Wong has exhibited conscience and has exhibited a sense of decency, gives this Court reason to think -- and we're talking, really, 25, 30 years down the line, Your Honor, when the better part of his life, the heart of his life, will already have been taken away from him, that he'll be able to return to society and function as a normal human being.

THE COURT: Thank you, Mr. Epstein. Does the Government wish to be heard?

MS. LYNCH: Yes, Your Honor. The Government strongly opposes this motion for downward departure for the reasons set forth in our submission to the Government. Mr. Epstein essentially argues -- and he argues very strongly, and he points to several factors to indicate that this defendant has not tried to and is not trying to subvert the criminal justice system. The Government feels that ever since this defendant first had contact with the law, that is all he has been trying to do, is subvert the criminal justice system.

As soon as he was arrested for the murders at the Tian Chow restaurant, he was sent to Riker's Island, stayed there some time. The Court will recall that this defendant,

Alex Wong, set in progress the bribery scheme of corrections officer Santana and received a job to which officer Santana would have given to someone else in exchange for that money.

The defendant was constantly scheming within the prison to obtain a better life for himself, and we think that the transcripts submitted as Exhibit A of our letter does strongly set forth the fact that, in fact, no matter what his initial reason for going to see the psychiatrist or the psychologist, and in fact, depression, I would imagine, is common in prison, that once he was there, he saw a potential and he again tried to use it to his benefit, and the story that he sets forth in this transcript as to how he's going to relay certain -- actually, certain facts he has already relayed to -- Mr. May, I believe, is the name, and what he intends to have Mr. May do with these reports.

The whole theme of it is mocking of the entire criminal justice system as evidenced by the fact that there are chuckles and laughs throughout that very portion of the transcript. Now, I would also point out, as we point out in our submission, this was right in the middle of the taped conversations wherein this defendant is literally begging Brian Chan, his codefendant, to have Chen I. Chung give the order to kill Carol Wang. That does not -- that is not consistent with someone who is leaving the Green Dragons and striving for a therapeutic relationship and striving to

understand themselves and better themselves.

What it is consistent with is this defendant trying every angle he can to get out of the mess he has gotten himself into by committing those murders. If he cannot get the witness killed, he will try and have the psychologist at Riker's Island submit a favorable report to him. While he's on Riker's Island, he will try and have a corrections officer take care of him. I would also remind the Court that in several of the taped conversations wherein this defendant Alex Wong is calling out from prison, he's also repeatedly asking for razor blades to be brought into the prison system.

That is totally inconsistent with any rehabilitative efforts or any efforts to steer one's life on to a better course of conduct than what it's already been on. Now, if there's anything that totally destroys the Riker's Island psychiatrist visits -- would be two facts. First, the defendant has not chosen to continue any kind of treatment, absent that that he submitted himself to for the purposes of sentencing. That also indicates, at least to the Government, that he's not serious about pursuing any kind of therapy unless it can serve him some kind of substantial benefit.

Also, his subsequent criminal conduct, as we've pointed out to the Court, and we've attached the copy of the complaint and arrest warrant in the action in the Southern District matter, that action occurred some short weeks after

the defendant was convicted. The arrest warrant and complaint were signed some weeks ago. We received them yesterday, actually, in our offices, and as I indicate, I had been informed by the assistant in charge of that case, they do intend to have Mr. Wong produced in the Southern District in the early portion of next week to answer those charges.

So we're not asking you to rely on those charges here. We bring that matter to your attention because pending charges are filed against him now, and the Court should be aware of that, but it also indicates that he's not on any rehabilitative course. Mr. Epstein argues that the defendant is a much better person, so to speak, when he's separated from the Green Dragons. This complaint and arrest warrant indicate that when he's separated from the Green Dragons, what he does is he finds some other individual to associate with and he commits violent acts with them, because, in fact, the individual also named with Mr. Wong in the Southern District complaint is not a Green Dragon member. He's another Asian inmate at the MCC, but he's not a Green Dragon member.

So some short weeks after his conviction for these activities, the defendant -- yes, separated from his Green Dragon brothers -- finds someone else, hooks up with them, and begins a violent act again with another individual. This is a defendant who presents a different side of himself to different people when it would be to his advantage. I have no

doubt that Mr. Epstein has sincerely seen the defendant being calm and courteous toward him, because that's to his advantage.

The Government submits the true face of Alex Wong is seen on the tapes, his own voice, when he was totally unaware he was being scrutinized or watched, or that he'd come under Government supervision. When he is heard begging Brian Chan to have Carol Wang killed, when he is heard begging for razor blades, when he is heard describing how he's got this scheme with the corrections officer going, that is the true Alex Wong. It continued after his adult years.

On this issue -- and I would also note that what the defendant exhibits is a strong sense of self preservation, which no one can deny anyone for having, but that is what the defendant's actions are consistent with, not remorse, not feeling sorry for what he has done, and certainly not any rehabilitative efforts sufficient to allow this Court to downwardly depart. Mr. Epstein argues that this defendant is not consistently vicious or sadistic. I think the evidence that this Court has heard so far contravenes that as to be obvious.

This Court has heard what happened in the Tian Chow restaurant. This defendant may have adopted the ways of the Green Dragons as some kind of surrogate family. He was sent there to kill one person. He ended up killing two. Because

of him, Christine Galavan lost her husband and the chance to have a family with him. Because of this defendant, Gregory Hyde will have pain for every day of his life, and Mr. Chan has a scar on his arm, and the other people in that restaurant were also terrorized also.

He was not forced to do these actions by some surrogate family. Chen I. Chung was not in the background saying oh, kill more people. He took it upon himself, and I think the evidence, as we point out, the description of the defendant's behavior in that restaurant as cool, calm and very, very cold blooded shows that he took these actions independently. He took them for his own gain within the Green Dragons, and he took them knowingly. He acted as an adult at that time. He should be punished as one now.

Just on the issue of the lack of youthful guidance, I think that to say that because the defendant remained with a parent who worked long and hard to support him he was abandoned in some way is ludicrous. Yes, his mother left him, but she left him with a stepfather who remained a custodial parent despite not being a blood relative to this defendant, who provided a home for him, a roof over his head and food and clothing for his back, and this defendant chose to abandon that.

To say, as Mr. Epstein argues in his letter, that there was some kind of negative relationship there, in fact

the presentence report indicates that the defendant and his stepfather had a very good relationship. The negative relationship is with the absent mother, but the defendant and his stepfather had a very good relationship. Now, the stepfather apparently discouraged him from playing sports. That hardly constitutes abuse, abandonment or deprivation, or anything sufficient to rise to the level that would allow this Court to downwardly depart, to find that there was any significant deprivation in this defendant's life, when in fact, what his life indicates is a family that had difficulties but where in -- at least one person of that family, the father, was trying to hold them together.

This defendant chose to walk away. I would also remind the Court that during the testimony of Alec Yim, one of the cooperating witnesses here, Mr. Yim testified that when he, Mr. Yim, was joining the Green Dragons, after having run away from home, he was introduced to the defendant Alex Wong as a representative of the Green Dragons, and it was Mr. Yim's impression that Mr. Wong, in fact, had to approve of him, and Mr. Wong, in fact, did introduce Mr. Yim and his two friends who had run away with him to other members of the Green Dragons, some who were not on trial, one of whom, Danny Ngo, was on trial.

So the defendant Alex Wong, having voluntarily left this custodial parent, who spent every day of the week working

to support him, then moved into a leadership position within the Green Dragons. Mr. Yim also testified that when he, Mr. Yim, moved into his first Green Dragon apartment, that Mr. Alex Wong was the Green Dragon in charge of that apartment and responsible for, for example, storing firearms in that apartment and doling them out to the younger Green Dragon members when they went out on their various missions to terrorize people all through the streets of Queens.

And that's what this defendant is truly like. That's the true personality of Mr. Alex Wong. He hasn't shown any rehabilitative efforts, and the Government doesn't feel that he ever will. I think his behavior in the Tian Chow restaurant is illustrative of exactly how he goes about his criminal activity. His behavior since then, trying every angle he can get to avoid responsibility for it, is indicative of the true face of Alex Wong. We strongly oppose this motion for a downward departure and request that it be denied.

MR. EPSTEIN: Your Honor, could I just make one brief comment?

THE COURT: I have seen two written submissions and now oral submissions. I don't want to go on all afternoon. I'll give you a brief opportunity to respond, but I don't want to go on for a half an hour here.

MR. EPSTEIN: I have no intention of going on for a half hour, Your Honor. It just seems to me -- I am not a

psychiatrist, but I do find it somewhat disturbing that we can submit a substantial report which talks about Mr. Wong's potential for rehabilitation and the Government can so vehemently oppose it without having their own psychiatrist either examine Mr. Wong or examine the report itself.

THE COURT: Mr. Epstein, perhaps because you come into this case late, you see this as the opportunity to try and help your client, who is in a very difficult situation, and I applaud you for that, but I do not find it grounds for downward departure, nor do I feel a need to have any other psychiatrist examine your client. The Government takes the position that Mr. Wong is eternally unrehabilitatable. I am not so pessimistic as that.

I find it difficult to think that there is any human being who, given intensive and extensive medical treatment and assistance could not get back on the road to humanity, though I will say this case tests that view more than any other, but I'll assume that there is some potential for rehabilitation, even in Alex Wong. I'll also assume -- indeed, I accept the fact -- that that is a factor that this Court must consider in imposing sentence. It is a factor. It is not the factor.

Sentence is not imposed solely with the purpose of picking a date by which a defendant is rehabilitated. It is a factor for consideration. Other factors that must be considered, as I have said in sentencing other defendants, are

adequately reflecting society's view of how much it abhors the crime committed, and here I have Mr. Wong before me because of the commission of the most heinous type of crime, murder.

Now, having said that, I will say that why I do not depart for rehabilitative purposes is that even the respected psychiatric report that's been submitted to me recognizes a number of problems that Mr. Wong has. What I am being asked to do is gamble, and what I'm being asked to do is gamble with the safety of society. As Ms. Lynch properly points out, Mr. Wong didn't have a particular target when he went and shot. Unexplainable, unforgivable as that would be, he went and randomly shot up a restaurant, causing pain and horror to people that I'll discuss in a moment.

Under those circumstances, to talk about the potential for rehabilitation is very different from talking about the potential for rehabilitation with someone who involves themselves in a serious crime but not one involving murder. Now, I also have to say in this regard, with respect to the potential for rehabilitation, that it hinges not only on the present psychiatric report but on the fact that Mr. Wong had once before sought psychiatric guidance.

At best, viewing this in the light most favorable to him, that attempt to reach out for a psychiatrist or psychologist at Riker's Island suggests mixed motives at that time. If his view was genuine, which I have to express some

skepticism about, because I recognize that given the boredom of prison life, any break from the routine is sometimes welcome, that help was sought at the same time that he was bribing a prison official, and most horribly, seeking to kill the one witness in his case.

Mr. Epstein, this is a case in which overuse of the word chilling is easy for the Court, but if there is evidence that was chilling in this case, it was listening to the tape recordings of your client urging his fellow Green Dragon members to kill Carol Wong for the simple reason that she could identify him as one of the people who committed murder in that restaurant that night. And his willingness to kill another human being, to take a third life, in order to avoid any kind of punishment for his crimes is so disturbing to this Court that I am not prepared to depart on the theory that he is capable of rehabilitation.

Now, with respect to the lack of youthful guidance, here again, I recognize that there are situations where perhaps a Court would appropriately depart because of a lack of youthful guidance. This is not such a case, in my view, and I say it for this reason. This was not a defendant who was abandoned. I recognize the difficulty that his mother did not play the role in his life that a mother should have. But he did have a responsible adult, his stepfather, who took care of him, and to suggest that his father, because he had to work

very hard, very long hours, and a very long week, abandoned him in the same sense as occurred in the Floyd case is to insult the hundreds of thousands of families who remain strong, responsible and law abiding under similar circumstances.

Indeed, your client expressed on at least one occasion the view that what he should have felt because of his father's hard work was some debt to him, some obligation to turn his own life into something better. Instead, he chose, at least on one occasion, to take a number of lives. I do not think that I can adequately deal with the severity of the criminal conduct here by departing in the way you suggested, and so I do not intend to do so. Do you wish to be heard any further with respect to sentence, Mr. Epstein?

MR. EPSTEIN: No, Your Honor. It seems once the Court refuses to depart, then the Court's discretion is more or less limiting.

THE COURT: Mr. Wong, do you wish to say anything in your own behalf?

THE DEFENDANT WONG: No, I don't.

THE COURT: Ms. Lynch, is there anything further you'd like to say?

MS. LYNCH: No, Your Honor.

THE COURT: Mr. Wong, in some ways it may seem that because you're before the Court for only three counts of

conviction that somehow your conduct is less serious than that of other defendants whom I have sentenced this morning. I do not view it that way at all. Certainly, among the more horrible crimes that this Court heard were the witnesses who testified about the killing of Mr. Ting, the killing of Mr. Galavan. His wife's testimony in this regard will stay with me for many years.

Whether it had any effect on you I cannot say, but no one who heard her testify could feel that they had anything but a horror and distress about what that evening must have been like, and a horror and a distress that any human being could have turned a gun on people the way that had to have happened for her husband to die. I also will have to remember as I think about a sentence in this case that Greg Hyde will never walk again without considerable difficulty, and that Carol Wong is alive today only because you were unable to complete the plans you had for her.

All of these factors lead me to think that the appropriate sentence in your case is life imprisonment. I sentence you to on Count 1 to the term of life incarceration, a five year term of supervised release, and a $250,000 fine. On Count 2, I sentence you to life imprisonment, a five year term of supervised release, and a $250,000 fine. On Count 3, I sentence you to ten years imprisonment, a three year term of supervised release, and a $250,000 fine. The terms of

incarceration, the supervised release and the fines will run concurrently. I impose a $150 order of special assessment to reflect the three counts of conviction. Is there an application, Ms. Lynch?

MS. LYNCH: Move to dismiss the underlying and related indictments.

THE COURT: That's granted. Mr. Epstein, you will file --

MR. EPSTEIN: Yes.

THE COURT: -- timely notice of appeal?

MR. EPSTEIN: I will. Thank you very much, Your Honor.

MS. LYNCH: Your Honor, I just want to make one thing -- I think you may have said Count 3. I believe it was --

THE COURT: I'm sorry.

MS. LYNCH: -- Count 14 --

THE COURT: Count 14.

MS. LYNCH: -- was the substantive count of conviction.

THE COURT: I'm sorry, it's the third count of conviction. Count 14. Thank you, Ms. Lynch.

MS. LYNCH: Thank you, Your Honor.

THE COURT: I'd like to turn now to Joseph Wang.

MR. PADDEN: For the defendant, Michael Padden,